L. R. WYATT et al v. WHEELER & WILSON MANUFAC-
TURING COMPANY et al.

*Statutes—Enactment—Ratification—Signatures of Presi-
ding Officers Fraudulently Procured or Affixed by
Mistake.*

(For Syllabus see *Carr* v. *Coke, ante.*)

On the 14th of March, A. D. 1895, the plaintiff L. R.
Wyatt, executed to the plaintiffs. Job P. Wyatt and J.
N. Holding, the deed of assignment attached to the com-
plaint conveying the large real and personal estate embraced
therein and making preference of certain creditors named
therein.

Thereupon sundry creditors alleging said deed to be void
under the "Act to Regulate Assignments and Other Like
Conveyances in North Carolina," purporting to have been
passed by the last General Assembly of this State and to
have been ratified on the 13th day of March, 1895, obtained
judgments against the said L. R. Wyatt in Wake Superior
Court, and placed executions thereon in the hands of the
Sheriff of Wake county, who levied the same upon the
tangible property embraced in said deed of assignment and
was proceeding to sell the same, when the said trustor and
trustees in behalf of themselves and all the creditors of the
said L. R. Wyatt who should come in and make themselves
parties plaintiff and contribute to the costs and expense of
this action instituted this action against the said judgment
creditors, asking for an injunction against said sale and
such other relief as they might be entitled to. An order
was made requiring the defendants to show cause before
His Honor Judge Starbuck, holding the April Term of the
Superior Court of Wake County, why the injunction should

WYATT *v.* MANUFACTURING COMPANY.

not be granted and that the defendants be restrained in the meanwhile.

The cause coming on to be heard at said term and having been fully argued, His Honor rendered the judgment dismissing this action and vacating the injunction. The plaintiffs excepted to said judgment in that—

1st. It adjudged that the validity of the act in question could not be impeached by evidence of non compliance with the parliamentary requisites and forms of enactment.

2d. That the Court had no jurisdiction to hear such impeaching evidence.

3d. It adjudged that the action be dismissed for want of jurisdiction.

4th. That the plaintiffs and their sureties pay the costs of the action.

5th. That the injunction be dissolved.

Plaintiff appealed.

*Messrs. Strong & Strong* and *J. N. Holding*, for plaintiffs (appellants).

*Messrs Argo & Snow*, for defendants.

FAIRCLOTH, C. J.: For the reasons assigned in *Carr* v. *Coke*, at this Term, the judgment of the court below is sustained.                                      Affirmed.

CLARK, J. (dissenting): This case resembles much that of *Carr* v. *Coke*, at this Term, an investigation of the same fraud being asked, and it is unnecessary to repeat the reasons given in the dissenting opinions filed in that case. In this case the plaintiffs claim under an assignment executed in accordance with the laws heretofore in force in this State, which in this respect legislature after legislature, including the present one, has declined to alter. The plaintiffs contend that such assignment is valid, and that their

rights are not affected by the pretended "assignment law" which after being defeated on its passage in the present General Assembly was surreptitiously and fraudulently procured to be signed by a deception practiced on the Speakers. The action was dismissed below on the ground that, taking the allegations to be true—and indeed they were not seriously controverted on the argument—the Court had no jurisdiction to right this great wrong and fraud.

Without passing upon the doubtful question whether the validity of the statute can be properly questioned in the somewhat collateral way in which it is presented in this case, I cannot concur in the reasons given for the decision by the Court. It would seem that certainly the Speakers of the two Houses should have been allowed to testify that this fraud had been practiced on them and that their signatures had not been knowingly and intentionally placed to a bill which they knew had not been passed, but which had been defeated. This was due to them, to the legislature and to the people. The people are entitled, as a sacred and inviolable right, to be governed by no laws save those enacted by their representatives duly and legally assembled. The act of a corrupt and hired villian, whose proper place is in the penitentiary, should by no process of reasoning or refinement of logic be imposed on the people, in express contradiction to a vote of their General Assembly. The power of consolidated wealth, acting through the channel of a purchased and hireling lobby, is a growing evil in all American legislation. The solemn and unmistakable issue in this case, brushing aside all technicalities, is simply this: Shall the law be what the Representatives of the people declare it shall be, or shall the will of powerful and menacing combinations of capital, acting through the lobbyists, with which they everywhere assail legislative action, override and be substituted for the popular will? To a

116—18

fearful extent this has been the result in Congress and in many State legislatures, but by more devious methods. This is the first instance in which one of these combinations, failing to secure its end by *influencing* legislation in the usual mode, has boldly and cynically defied the action of the General Assembly and set aside its negative vote by fraudulently substituting the defeated bill as a genuine one, and procuring the unintentional signatures of the Speakers. For the first time in American history accumulated capital and its hirelings have dared to take so bold a step.

We are asked to say that such action is beyond the power of the Courts. The plaintiffs have no power to call the Legislature together, and they may be unable to satisfy the Governor that their wrongs, great as they are, are sufficient to tax the public with the expensive precedent of re-summoning the legislature whenever the fraud of a lobbyist is discovered. There is an easy, a cheap and speedy remedy by setting aside the signatures, as fraudulent, upon the testimony of the Speakers to that effect and the verdict of a jury. Upon the verdict of a jury, every man is dependent for the protection of his property, his reputation, his liberty and his life. Surely it is a competent tribunal to decide whether the signatures to a piece of paper were knowingly and intentionally affixed by the Speakers with the assent of their respective Houses, or whether the bill had been defeated on its attempted passage and notwithstanding such defeat the signatures and certificate of the Speakers had been thereafter procured by a bold and shameless fraud. Reduced to its last analysis, the question is simply whether legislatures shall legislate, and whether the time-honored institution of "twelve good men and true" shall be trusted to declare, upon the testimony of the presiding officers of the two Houses, that a

gross fraud was perpetrated on them in procuring their signatures to a bill which had not been enacted by the two Houses, but had been tabled.

This is not a conflict of authority between the legislature and the Court, nor is the Court asked to go behind the authenticated declaration by the legislature of any action it has taken. The very question to be investigated is whether the legislature authorized such authentication. The demurrer admits that it did not. The Court is simply asked to say which it will regard as valid,—the action of the legislature itself in voting down this bill, or that of a lobbyist in afterwards, by fraud, procuring the unintenal and untrue certificate of the speakers that it had passed.

This is not an occasion when public policy or individual rights can tolerate the suppression of an investigation. The investigation should be full, free and searching. " The lights should be turned on "—not off. No one who is honest and pure and of good repute need fear an investigation. Others have no claim to be protected from it.

MONTGOMERY, J. (concurring) : This case presents the same question that was heard in *Carr* v. *Coke*, at this Term, *i. e.*, Can the courts go behind the records of the General Assembly to consider the method by which an Act was passed when the Act, on its face, is in due form ratified by the genuine signatures of the presiding officers in the presence of their respective Houses assembled, and filed with the Secretary of State, as the custodian of all the legislative Acts.

In *Carr* v. *Coke*, *supra*, there was no allegation of *forgery* whatever, and any argument based on such ground is misleading, unjust to His Honor below and aside from the legal question involved. It was stated in that case that the question was one of jurisdiction, and that was the

sole question under review and the reasoning and the authorities are there to be found.

A suggestion has been made and followed up by elaborate arguments, to the effect that in numerous instances in the cases of grants by the State of the same land to two parties, at different dates, this Court has gone behind the Great Seal of the State attached to the grants issued by the Executive—a co-ordinate branch of the State Government—and it is concluded that if the Court can go behind the Great Seal of the State and declare the Act of the Executive in issuing a grant to the junior enterer to be void because the second entry was obtained in fraud and with notice of first entry, therefore the Court can as well go behind the Legislative record and declare the Act void because it was procured by fraud and the like. There is no room for this suggestion and the argument based on it, I think, finds no support in the Reports of this Court. The whole is based, I think, on a misapprehension of the facts in this case as well as of the law laid down by this Court in cases heretofore decided. No case decided by this Court can be found in which it is held that any grant of land by the State with its Seal affixed by the Executive is void or invalid (except when the entry or grant is so defective that the land cannot be located) for the reason that the grant was obtained by fraud upon the rights of the first enterer, who was the junior grantee, nor any case in which it is held, as stated in the argument that "Equity vacates a patent which the Governor signs"—"because it is procured in fraud of the superior right of a single citizen." On the contrary this Court has uniformly held that the grant or patent issued to the second enterer (first grantee) passes the legal title to the grantee and declares that he holds it in trust for the first enterer (second grantee) for the reason that he obtained his grant with notice of

the equity of the first enterer and in fraud of his rights and the Court orders the said grantee to convey the legal title to the equitable owner; and so these co-ordinate departments work in harmony. And in case of future litigation in which the title was involved the owner would have to invoke this grant, obtained by fraudulent conduct of the first grantee, in order to establish his title. In the late case of *Grayson* v. *English*, 115 N. C., 358, His Honor below adjudged that the plaintiffs "hold the legal title to land in controversy in trust for the defendant, and that said plaintiffs execute to the defendant a good and sufficient deed releasing all their right, title and interest in said lands," and this Court affirmed the judgment below on numerous authorities, Associate Justice AVERY delivering the opinion of the Court and saying "The junior enterer being affected by it (notice) would hold under any grant taken out by him subject to the right of the person holding the older entry to take out a grant also and have the senior grantee declared a trustee and ordered to convey to him." So we find upon the authorities that this Court has not declared the "older grant issued by the head of the Executive Department null and void," but has allowed it to stand, and adjusted the equities between interested parties. In this case if His Honor had empanneled a jury and had the pleadings read in the usual manner, and when evidence was offered for the plaintiff's purpose, had held the evidence incompetent the same question as the present would have been presented; and a useless formality can have but little bearing upon the important question intended to be presented by the plaintiff. There is no error.

AVERY, J. (dissenting): But for the direct answer in the concurring opinion filed in this case to my argument in

*Carr* v. *Coke*, I should be content to concur in the clear and concise presentation of the points made by Justice CLARK.

Dr. Wharton, one of the most eminent authorities on criminal law says, "Forgery at common law is defined by Sir William Blackstone as the fraudulent making or altering of a writing to the prejudice of another's rights, and by Mr. East as the false making, *malo animo*, of any written instrument." The plaintiff alleged, 1st, that a written enrolled bill was fraudulently made; 2nd, that it was used to the prejudice of the rights of all the people of North Carolina, in that it restricted the debtor in his right to dispose of his property and in that it deprived the creditor of the means of securing what was due to him.

The Judge below holds that, admitting all this, the court has no power to remedy the great wrong to which the people are reluctantly submitting. The act of the hireling, who was instrumental in perpetrating a fraud so prejudicial to the public, certainly had all of the turpitude of the most heinous of technical forgeries, and it is needless to discuss the question whether an indictment would lie for that offence. Society can better afford to condone the crime of the ignorant negro, who so clumsily signed the name of Major Vass to an order for ten pounds of bacon (*State* v. *Collins*, 115 N. C., 716) than the great wrong of procuring the enrollment and ratification, as a law, of an instrument prepared by an expert agent of foreign capitalists. Yet the perpetrator of the petty offence is sentenced to hard labor in the penitentiary, while the instrument as well as the authors of the most gigantic fraud known to history are safely entrenched behind a constitutional quibble.

Under the circumstances I fail to comprehend how I have been unjust to the learned Judge, who heard the case

below, in characterizing the conduct, for which he held that the law afforded no redress, as morally if not legally a forgery. In the presence of a great danger, which threatens the very security of popular government, it seems to me little less than trifling to waste time in discussing the speculative question, whether an indictment would lie against wrong doers, if discovered, when the burning question before us is whether the courts can or will first incidentally lend their aid in the detection of the guilty parties by ferreting out the fraud and vacating the covinous instrument.

It is earnestly maintained, that there is no room for the suggestion that the courts had ever gone behind a grant for land issued by the Governor, and that "the argument based on it finds no support in the Reports of this Court." Is it true or untrue that equity has vacated patents signed by the chief executive for an hundred years? It is conceded, that the Courts have ordered a senior grantee holding under a junior entry to convey to the junior grantee whose right was founded upon an older entry, because the latter was "the equitable owner." If the claimant under the younger grant holds the equitable estate, it follows of necessity, that the prior grant by the Governor, under the great Seal of the State, was ineffectual to convey, what it purported to pass, the beneficial ownership in the land, and, when the courts in the exercise of their equitable jurisdiction required the holder of the legal title to convey to the true owner, they gave precisely the same redress that was afforded in all other cases, where a deed for land had been successfully impeached for fraud.

A gives to B a thousand dollars to buy for him a tract of land that is to be sold by the Clerk of the Court at public auction. B purchases the land, pays for it with A's money and causes the Clerk to convey to him instead of A.

The only remedy that A has now is to file a complaint in the nature of a bill in equity and ask that B be compelled to convey the legal title, which he has procured by fraud, to the rightful owner. Would it be misapprehension of the law in such a case to say that equity vacated the deed which the Clerk signs, because it has been procured in fraud of the superior right of the man who furnished the money to pay for the land? It is familiar learning that parties were under the former practice compelled to resort to a Court of Equity for remedy in a vast majority of cases of fraud, and, even where courts of law could take cognizance, there was generally a concurrent jurisdiction in the Courts of Chancery. 8 Am. and En. Enc., p. 651. It is equally familiar learning that where parties were compelled to invoke the aid of a Court of Equity to avoid the operation of a conveyance of land, it was because in Court of Law the grantee in the deed which they sought to impeach was deemed to be the owner, and to hold the legal estate but subject to the right of the true owner to resort to equity and force him to convey. In all such cases the deed is declared ineffectual to pass the beneficial interest, and, when its operative force is destroyed, it is properly said to be vacated. The grant is vacated for fraud, whether a decree for cancellation be made or a reconveyance ordered to the party having the right to assert an equity. In either case the Court exercises its equitable jurisdiction to vacate or set aside a conveyance. Adams Eq., 174. In the supposed case of constructive trust, which has been used for illustration, the conveyance is set aside or vacated by compelling the fraudulent grantee from the Clerk or Commissioners to convey the legal estate to the rightful equitable owner, just as the senior grantee is compelled to convey to the junior grantee, who has the right to claim equitable ownership. In either case the holder of

the legal estate is in law the owner, and will hold the property unless the true owner invoke the aid of equity to undo the fraud. The parallel may be extended by calling attention to the fact that neither the Clerk nor the Governor is a necessary party to the proceeding to vacate the deed or grant. It is equally unnecessary to make the two presiding officers, who have appended their signatures to the forged bill, parties to the suit brought by an interested party to set aside or vacate what purports to be a ratified Act and have it declared inoperative as a law. It is no misapprehension of fact or law to state that they have merely appended their signatures as the representative heads of the Legislative Department (in accordance with the requirements of Art. 2, Sec. 23, of the Constitution) to a bill, just as the Governor signs and attaches the Seal of the State to a grant, in compliance with Art. 3, Sec. 16. With all of the additional light that has been thrown upon the issues of law involved I am still unable to comprehend why the Courts are prohibited from declaring that a paper signed by the heads of the Legislative branches is inoperative because the attestation was obtained by fraud, while it is admitted to be competent for the same tribunals to adjudge that the Governor's grant does not pass the equitable interest, which is the true and rightful ownership of land. The only difference seems to be that the signatures to the one instrument are obtained in fraud of the rights of the whole body of the people of the State, while but a single individual is interested in setting aside the other.

But supposing, for the sake of argument, that, when the judicial arm of the government declares that the grant of the Governor has failed to pass the equitable estate, which it purported to convey, it is not trenching upon the independent province of the executive department, because the

Court concedes that the legal estate passes. What will be said to the suggestion, that under the act of 1798, which is still in force (*The Code*, Secs. 2786 and 2787; *Rev. Code*, Ch. 42, Sec. '29; *Rev. Stat.*, Chap. 42, Sec. 29) Courts of law were empowered, where it was alleged that a grant had been issued since the 4th of July, 1776, by means of "false suggestion, surprise or fraud" to repeal and vacate the patent and that a copy of the decree may be filed in the office of the Secretary of State as notice that the Court has declared the grant of the Governor null and void? Does not this statute provide for vacating a patent both, as a conveyance of the legal and equitable estate because it has been issued "in fraud of the rights of a single citizen?" This proceeding (formerly a *scire facias*, now a petition) was allowed to be instituted in a Court of law only by a senior against a junior grantee, the distinction being carefully drawn that the remedy of the senior enterer against the senior grantee of the same land for fraud in procuring his grant, was in chancery. *O'Kelly* v. *Clayton*, 2 Dev. and Bat., 246; *Crow* v. *Holland*, 4 Dev., 417; *Carter* v. *White*, 101 N. C., 30. So that a grant, issued in fraud of the rights of an older grantee, on the birthday of American Independence, has been ever since its execution liable to be repealed and vacated by a common law Court, and pronounced ineffectual to convey any interest either in law or equity, because it could be shown to have been obtained by fraud. If the Courts can go back nearly 120 years to vacate for fraud a grant signed by the Governor and order its decree to be filed in the office of the Secretary of State as notice to the world, why should it imperil the independence of the legislative department to declare null and void and vacate for fraud a forged paper deposited in the very same office and purporting to be a statute, signed by

the presiding officers, when it was, in fact, the covinous work of a forger ?

It is suggested, that, where a junior grantee causes a senior grant to be set aside for fraud, if future litigation should arise involving the title, the former "would have to invoke this grant, obtained by the fraudulent conduct of the first grantee in order to establish his title." Is this a sound legal proposition ? I think it is very clearly untenable. When such junior grantee is compelled to eject a trespasser, he need offer in order to establish his *prima facie* right to recover nothing but the grant to himself from the State. *Mobley* v. *Griffin*, 104 N. C., 112. Should the trespasser, whether he should be the original senior grantee or his heirs, or another, set up the older grant in order to show a better outstanding title, it would only render it necessary to offer in reply the record of the suit in equity, in which the grant was vacated, in order to estop the grantee or his heirs, or to disprove the allegation of another that there was a better outstanding title. *Isler* v. *Harrison*, 71 N. C., 64; *Davis* v. *Higgins*, 87 N. C., 300, and cases cited. If the junior grantee, after obtaining his decree to set aside the senior grant, should attempt to use it in deraigning his title against a trespasser in possession, the latter could still compel him to rely upon the junior grant by offering in evidence the record of the same suit, showing that the grant relied on had been declared invalid.

I regret that it has become necessary to draw in question such plain elementary principles in order to sustain the soundness of the conclusion reached by the Court in these cases.

But, if it were conceded to be a correct legal proposition that a senior enterer would be compelled in all cases to use the senior grant in deraigning his title from the State, and that the senior grant is not therefore null and void, we

must still confront the stubborn fact that this Court (in
*O'Kelly* v. *Clayton, supra; Carter* v. *White, supra,* and other
cases) has *repeatedly* recognized the validity of the act of
1798 and the jurisdiction of the Courts under its authority
to vacate and repeal grants, both as conveyances of the
legal and equitable estates.

I still confidently maintain upon the plain principles
stated and the authorities cited, that, when a grant from
the Governor fails to pass the equitable estate as against a
more meritorious claimant, the Courts, in so declaring and
decreeing a conveyance of the legal estate to the rightful
owner, adjudge the grant ineffectual originally and void as
a conveyance of the equitable or beneficial estate.